Argued June 20, reversed and remanded August 8, 1978

STATE OF OREGON, *Respondent,*
*v.*
JOSEPH CHARLES KILPATRICK, *Appellant.*
(No. C 77-07-10025, CA 9529)
582 P2d 480

Thomas J. Crabtree, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Johnson, Gillette and Roberts, Judges.

GILLETTE, J.

## GILLETTE, J.

Defendant, convicted after a jury trial of Robbery in the First Degree, ORS 164.415,[1] and sentenced to fifteen years, assigns two errors on appeal: First he claims that the indictment against him should have been dismissed because of the unexplained disappearance of traces of blood from the knife which was the weapon used in the robbery; second, he claims the trial court abused its discretion in denying him a new trial based upon newly discovered evidence allegedly likely to change the outcome. We agree that defendant is entitled to a new trial, and reverse.

The victim, Loren Russell, was robbed at the Cordova Hotel during the early morning hours of July 17, 1977. Around midnight the victim had gone to a neighborhood bar, the Jazz Quarry, where he drank a significant amount. While there, he was talked into loaning a girl some money. He gave her a twenty dollar bill which she was going to cash and return with some change. The girl indicated that she lived in the Cordova Annex, a part of the Cordova Hotel.

When the girl did not return, Russell became angry and went to the Cordova Annex, went up to the third

[1]ORS 164.415 provides:

"(1) A person commits the crime of robbery in the first degree if he violates ORS 164.395 and he:

"(a) Is armed with a deadly weapon; or

"(b) Uses or attempts to use a dangerous weapon; or

"(c) Causes or attempts to cause serious physical injury to any person.

"(2) Robbery in the first degree is a Class A felony."

ORS 164.395 provides:

"(1) A person commits the crime of robbery in the third degree if in the course of committing or attempting to commit theft he uses or threatens the immediate use of physical force upon another person with the intent of:

"(a) Preventing or overcoming resistance to his taking of the property or to his retention thereof immediately after the taking; or

"(b) Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft.

"(2) Robbery in the third degree is a Class C felony."

[ 751 ]

*floor and could hear a party going on at the end of one of the halls.* Through an open door he saw the woman who took the twenty dollars from him. When he went inside a black man, who would later become his assailant, followed him in.

Russell began to talk to the girl about getting the change from the twenty dollar bill. The eventual assailant, however, dominated the conversation. Eventually, the man wanted to talk to Russell and to the girl in private (there was another man in the room), so he took the victim and the girl into another apartment and locked the door behind them. The assailant started yelling "I want my twenty dollars." Russell reached up to unlock the door and then the assailant grabbed him. They began fighting and ended up on the floor. During this time the girl was screaming and trying to pull the assailant off Russell. The robber yelled "I am going to cut you, I am going to cut you." Russell said he saw a knife blade once; he received a cut on the arm. The girl grabbed the assailant's wrist, apparently to prevent his stabbing Russell. The assailant took Russell's watch and his wallet during the scuffle.

Subsequently, Russell called the police, who came to investigate. As Russell and two officers were walking down the steps out of the hotel, they saw the defendant sitting on the stairs. This was approximately three hours after the incident had occurred. The defendant was identified by Russell as the assailant, was found to have Russell's watch, and was then placed under arrest. The defendant claimed that he had won the watch in a crap game earlier that morning.

At the lineup three to four weeks later, Russell picked out a person other than defendant as the perpetrator of the offense.

Officer Bogus was one of the officers called to interview Russell on the morning of the crime and was one of those present when defendant was arrested. In

searching the defendant, a pocket knife was found. Bogus said he took the knife from defendant and put it in his pocket. He testified that the largest blade appeared to have some recent blood on it. It was fresh but semi-coagulated. Bogus said he did not wipe the blood off nor did he have any tests performed on it.

Officer James Wold, the other officer involved, said he observed a cut on Russell's upper arm which appeared to be a knife cut.

At trial, Russell positively identified the defendant as being the "assailant."

Fred Hames, a fellow inmate of defendant at the jail, testified that defendant had told him defendant had robbed a lawyer and the lawyer had identified the wrong man at the lineup. Russell was a lawyer. Defendant's first assignment of error raises questions concerning both the applicability of the due process rule enunciated in *Brady v. Maryland,* 373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963), and the statutory discovery principles of ORS 135.805 to 135.875.[2]

Testimony concerning the bloodstains on the knife was first elicited on cross examination. Officer Bogus testified he had seen the blood, had not wiped it off, and that (to his knowledge) no tests had been performed on it.

Nothing in the record establishes that any "tests" were performed upon the knife which the prosecution

---

[2]For the purposes of our inquiry the significant section of the statutes is ORS 135.815, which provides in pertinent part:

"Except as otherwise provided * * * the district attorney shall disclose to the defendant the following material and information within his possession or control:

"* * * * *

"(4) Any books, papers, documents, photographs or tangible objects:

"(a) Which the district attorney intends to offer at the trial; or

"(b) Which were obtained from or belong to the defendant."

would be required to disclose. *See* ORS 135.815(3); *State v. Koennecke,* 274 Or 169, 545 P2d 127 (1976). The knife itself, which the prosecution always intended to offer and did, in fact, offer, was available for inspection by the defense for some time prior to trial. There was no violation of the discovery statutes which would have even brought into play the question of whether or not some sanction against the state would have been in order.

On the constitutional ground, *Brady v. Maryland, supra,* forbids suppression of evidence favorable to the accused "where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution [in suppressing such evidence]." *Brady v. Maryland, supra,* 373 US at 87. The Oregon courts have interpreted this rule to mean that there must be "* * * at least *some* showing, to the extent reasonable under the circumstances of the particular case, to support at least a belief and contention in good faith that the evidence demanded is 'favorable' to the defendant and 'material' to his guilt or innocence." *State v. Koennecke, supra,* at 179. (Emphasis in original.) *See also State v. Hockings,* 29 Or App 139, 562 P2d 587 rev den (1977).

■ This record contains nothing beyond mere sepculation as to what would have been discovered had the blood remained on the knife. It is not even clear, from the testimony, that there would have been sufficient blood to permit a test. Had there been sufficient blood, there is nothing in the record to suggest that identification of the blood by type would have had any significant probative value in determining whether or not the blood was that of the defendant, the victim, or some third party. The defendant's showing was insufficient to meet the requirements of *State v. Koennecke, supra,* and the trial court appropriately denied his motion to dismiss the charging instrument.

[ 754 ]

Defendant's second assignment of error is the refusal to grant a new trial based upon newly discovered evidence. ORS 17.610.[3]

Newly discovered evidence which will justify a new trial (1) must be such as will probably change the result; (2) must have been discovered since the trial; (3) must not have been subject to discovery through the exercise of due diligence prior to trial; (4) must be material; (5) must not be merely accumulative to former evidence; and (6) must not be merely impeaching or contradictory of former evidence. *State v. Ellis,* 232 Or 70, 374 P2d 461 (1962); *State v. Williams,* 2 Or App 367, 371, 468 P2d 909 (1970).

In this case, the newly discovered evidence is the testimony of Walker Palmore, allegedly the other man who was present in the apartment the victim first entered at the hotel. There is no significant dispute about the exercise of due diligence, or the inability to discover the evidence prior to trial: both sides had tried to find Palmore without success. Rather, the sole real issue in the case is whether or not the testimony, if believed, would have been likely to change the result. We think that it would. Palmore testified that he was in the room with the girl when the victim arrived. He also observed a black man come into the room in the manner described by the victim, and saw that black man, the victim and the girl leave the room. Shortly after that, he was advised by the girl that a robbery had taken place. Palmore did not specifically see the fight or the robbery which occurred during the fight, but he testified unequivocally that the black man who

---

[3] ORS 17.610 provides in relevant part:

"A former judgment may be set aside and a new trial granted on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"* * * * *

"(4) Newly discovered evidence, material for the party making the application, which he could not with reasonable diligence have discovered and produced at the trial."

left his apartment with the girl and the victim was *not* the defendant.

Since, based upon the victim's own testimony, the man with whom the victim had talked in the presence of the girl and Walker Palmore was the man who later assaulted and robbed him, the necessary inference is that the man whom Palmore saw in his apartment was also the man who robbed the victim. And, since Palmore insists that the man was not the defendant, there is now a direct conflict in the testimony with respect to eyewitness identification. The victim had been drinking extensively on the evening of the assault, testified that he had difficulty telling one black from another, and identified the wrong party at a lineup. Based upon these facts, we believe that the defendant has carried his burden under ORS 17.610, and the trial court should have granted a new trial. It follows that the case must be reversed and remanded to the trial court for entry of an order granting a new trial.

Reversed and remanded for new trial.